IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ERIE DIVISION

| | |
|---|---|
| ANTHONY HAMMOND MURPHY,<br><br>Plaintiff,<br><br>v.<br><br>SPORTSMAN'S WAREHOUSE, INC.,<br><br>Defendant. | Civil Action No. 1:25-cv-202<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Anthony Hammond Murphy ("Murphy" or "Plaintiff") brings this action against Defendant Sportsman's Warehouse, Inc. ("Sportsman's Warehouse" or "Defendant") and makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations pertaining to Plaintiff, which are based on personal knowledge:

**NATURE AND SUMMARY OF THE ACTION**

1.      Defendant owns, leases, and/or operates physical facilities, including corporate offices, manufacturing, shipping, and distribution facilities, and/or retail storefronts in the United States.

2.      From its physical facilities, Defendant makes various goods, like outdoor gear and clothing, and services, like customer service, return processing, and technical support, available to consumers in Pennsylvania and across the country.

3.      Consumers may remotely access the goods and services at Defendant's physical facilities by phone and email, or through the internet at Defendant's website, located at https://www.sportsmans.com/ ("Website").

1

4.      Murphy is legally blind.

5.      As a result of his blindness, Murphy uses screen reader auxiliary aids to remotely access the goods and services available at Defendant's physical facilities through the Website.

6.      This action arises from Defendant's ongoing failure to effectively communicate with Murphy because the Website is not sufficiently compatible with screen reader auxiliary aids, thereby denying Murphy full and equal access to the goods and services available at Defendant's physical facilities.

## JURISDICTION AND VENUE

7.      The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

8.      Upon information and belief, Defendant promotes the Website, and the goods and services it sells via the Website, in Pennsylvania and to consumers who Defendant knows reside in Pennsylvania.

9.      Defendant's in-state sales through the Website, and Defendant's in-state promotion of the Website and the goods and services thereon, are closely related to Murphy's claim that Defendant discriminates against blind shoppers when selling Defendant's goods and services on the Website.

10.     Defendant purposefully avails itself of the privilege of conducting activities in Pennsylvania by operating an interactive commercial website that facilitates the knowing and repeated transmission of computer files into Pennsylvania over the internet.[1]

---

[1] *See Murphy v. Rolex Watch USA, Inc.*, No. 1:23-CV-00086-SPB, 2024 U.S. Dist. LEXIS 84515, at *17-18 (W.D. Pa. May 9, 2024) (Lanzillo, M.J.) (exercising personal jurisdiction over out-of-forum website operator in a website accessibility case); *Gniewkowski v. Lettuce Entertain You Enters.*, No. 2:16-cv-1898-AJS, Order, ECF 123 (W.D. Pa. Apr. 25, 2017), *clarified by Order of Court*, ECF 169 (W.D. Pa. June 22, 2017) (Schwab, J.) (same).

11.     Upon information and belief, Defendant places files of information, or cookies, on the hard drives of the computers, smartphones, and other devices of every Pennsylvania consumer when those devices are used to visit the Website.[2]

12.     Murphy was injured when he attempted to remotely access the goods and services available at Defendant's physical facilities through the Website while Murphy was physically located in Erie, Pennsylvania.

13.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Murphy's claims occurred.

## PARTIES

14.     Murphy is a natural person over the age of 18.

15.     He resides in and is a citizen of Erie, Pennsylvania.

16.     He graduated from Edinboro University with a degree in sociology in 1999 and today he works for the Commonwealth of Pennsylvania.

17.     Murphy has advocated for blind individuals his entire life.[3]

---

[2] A. Benjamin Spencer, *Jurisdiction and the Internet: Returning to Traditional Principles to Analyze Network-Mediated Contacts*, 2006 U. Ill. L. Rev. 71 (2005), http://illinoislawreview.org/wp-content/ilr-content/articles/2006/1/Spencer.pdf.

[3] *How did Erie plow crews do?: Your view from Facebook*, GoErie.com (Jan. 7, 2018), https://www.goerie.com/opinion/20180107/how-did-erie-plow-crews-do-your-view-from-facebook ("Anthony Hammond Murphy: As a visually impaired person, I find it very difficult to cross streets via curb cuts due to the snow and ice being plowed into these corners. The plow drivers should be allowed to triangulate and get the corners as well, and not just go north-south and east-west.").

18.    The United States District Court for the Western District of Pennsylvania has appointed Murphy to represent nationwide classes of blind consumers in class actions concerning the inaccessibility of commercial websites.[4]

19.    Defendant is a Utah corporation with a principal place of business in Utah.

20.    Defendant offers goods and services to the public from physical facilities that Defendant owns, operates, and/or controls, including its corporate offices, manufacturing, shipping, and distribution facilities, and/or retail storefronts.

21.    Defendant's physical facilities are open to the public, as Defendant allows the public to access the goods and services available at its physical facilities remotely through the Website.

## STANDING UP FOR TITLE III OF THE ADA

22.    "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the inability to choose. . . . However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[5]

---

[4] *See Murphy v. Charles Tyrwhitt, Inc.*, No. 1:20-cv-00056, Doc. 47 (W.D. Pa. Feb. 16, 2022) (Baxter, J.); *Murphy v. Le Sportsac, Inc.*, No. 1:22-cv-00058, Doc. 57 (W.D. Pa. July 6, 2023); *Murphy v. The Hundreds Is Huge, Inc*., No. 1:21-cv-00204, 2022 U.S. Dist. LEXIS 211942 (W.D. Pa. Nov. 17, 2022); *Murphy v. Eyebobs, LLC*, No. 1:21-cv-00017, Doc. 49 (W.D. Pa. Feb. 9, 2022).

[5] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (*citing* H.R. REP. No. 101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).

23.    More than thirty years "after the passage of the ADA, numerous facilities are still not compliant leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[6] and private individuals[7] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[8]

24.    Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[9] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled."[10]

25.    The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that because it "cannot investigate every place of public accommodation," "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[11]

26.    Consistent with these policies, Murphy files this case to ensure Defendant provides full and equal access to the goods and services that Defendant makes available to the public from its physical facilities.

---

[6] 42 U.S.C. § 12188(b).

[7] 42 U.S.C. § 12188(a).

[8] Johnson, *supra* note 5.

[9] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).

[10] *Id.* (*quoting Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suite*s, 538 F.3d 1031, 1040 (9th Cir. 2008) (same).

[11] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *see also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

## SUBSTANTIVE ALLEGATIONS

27.    Screen reader auxiliary aids allow blind persons to use websites and mobile apps to remotely access physical facilities, and the goods and services retailers provide at those physical facilities, like customer service, return processing, and technical support.

28.    Two of the most commonly used aids are JAWS from Freedom Scientific (available on Windows computers), and VoiceOver (available on macOS and iOS devices).

29.    "JAWS, Job Access With Speech, is the world's most popular screen reader, developed for computer users whose vision loss prevents them from seeing screen content or navigating with a mouse. JAWS provides speech and Braille output for the most popular computer applications on your PC. You will be able to navigate the Internet, write a document, read an email and create presentations from your office, remote desktop, or from home."[12]

30.    "VoiceOver is an industry-leading screen reader that tells you exactly what's happening on your device. Auditory descriptions of elements help you easily navigate your screen through simple gestures on a touchscreen or trackpad or a Bluetooth keyboard. . . . VoiceOver can also describe people, objects, text, and graphs in greater detail than ever. It's available in more than 60 languages and locales on iPhone, iPad, Mac, Apple Watch, Apple TV, and HomePod and offers deep customization options for your needs. Select and modify your favorite built-in voice for speech feedback, and tailor its verbosity, speed, and accompanying sound and haptic feedback to your own preferences."[13]



---

[12] *JAWS®*, Freedom Scientific, https://www.freedomscientific.com/products/software/jaws/ (last accessed Aug. 30, 2024).

[13] *Accessibility*, Apple, https://www.apple.com/accessibility/vision/ (last accessed Aug. 30, 2024).

31.    The images to the right show a retailer coding its website so blind shoppers can remotely access physical facilities, and the goods and services provided at those physical facilities.



32.    The first image illustrates what shoppers perceive visually when browsing the retailer's website with an iPhone. The second image shows the audio description highlighted for that image in green.

33.    Although invisible to the eye, screen reader auxiliary aids read the highlighted text of the second image aloud to describe that image to shoppers who cannot perceive content visually.

34.    In this example, when a screen reader user tabs to the image file, the website announces, "[o]ne burlap and cotton tote bag with a custom printed architectural company logo."

35.    Blind shoppers require audio descriptions, frequently called "alternative text," like this to access physical facilities, and the goods and services provided at physical facilities, through a website.

36.    Unfortunately, Defendant fails to effectively communicate with Murphy because the Website is not sufficiently compatible with screen reader auxiliary aids, thereby denying Murphy full and equal access to the goods and services available at Defendant's physical facilities.

37.     For example, from visiting the Website in November 2024 and from investigations performed on his behalf, Murphy learned that Defendant failed to effectively communicate with him, and with all blind screen reader users, in at least the following ways:

(a)     Defendant visually communicates information about its promotions in a pop-up window that Defendant displays to consumers who visit the Website from a new IP address. Consumers who perceive content visually will see the pop-up and understand how to sign up to receive more information. Defendant fails to effectively communicate this same information to screen reader users, including Plaintiff, because the Website fails to notify screen reader users when the pop-up appears. This ineffective communication makes it more difficult, or impossible, for Plaintiff to access Defendant's promotions. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/1012914245/a3cb35dc6a.

(b)     Defendant visually communicates information about how well its products are rated by consumers. Consumers who perceive content visually will recognize a 5-star rating system and understand that the more stars a product has, the better it has been received by past purchasers. Defendant fails to effectively communicate this same information to screen reader users, including Plaintiff, because the Website lacks sufficient alternative text to verbally communicate this rating information. This ineffective communication makes it difficult, or impossible, for Plaintiff to determine how other consumers like or dislike a particular product. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/1012914293/0830c6723f.

(c)     Defendant visually communicates a menu in a pop-up window on the Website. Consumers who perceive content visually can access the pop-up to view and navigate to various sections of the Website. Defendant fails to effectively communicate this same information

to screen reader users, including Plaintiff, because the Website fails to notify screen reader users of the menu sub-options. This ineffective communication makes it more difficult, or impossible, for Plaintiff to fully access and use this important navigational tool. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/1012914326/b0a2e6c7ee.

(d)     Defendant visually communicates a CAPTCHA challenge on the Website. Consumers who perceive content visually will see this CAPTCHA challenge and can complete it in order to successfully submit a contact or support form. Defendant fails to effectively communicate this same information to screen reader users, including Plaintiff, because the Website fails to notify screen readers users of the CAPTCHA challenge or provide an audio alternative. This ineffective communication makes it difficult, or impossible, for Plaintiff to contact Defendant through the online form, or report the Website's access barriers so they can be fixed. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/1012914293/0830c6723f.

38.     Consistent with public policy encouraging the resolution of "dispute[s] informally by means of a letter[,]" *see Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1208 (9th Cir. 2006), which "prelitigation solutions [are] clearly, the most expedient and cost-effective means of resolving" digital accessibility claims, *see Sipe v. Am. Casino & Ent. Properties*, LLC, 2016 WL 1580349, at *2-3 (W.D. Pa. Apr. 20, 2016), Murphy, through his counsel, contacted Defendant to discuss the discrimination Plaintiff experienced on Defendant's Website and the resolution of Plaintiff's claim. Unfortunately, that attempt was unsuccessful.

39.     Murphy returned to the Website in June 2025. From visiting the Website again, and from additional investigations performed on his behalf, Murphy learned that Defendant still fails

to effectively communicate with him, and with all blind screen reader users, in at least the following ways:

(a)     Defendant visually communicates information about how well its products are rated by consumers. Consumers who perceive content visually will recognize a 5-star rating system and understand that the more stars a product has, the better it has been received by past purchasers. Defendant fails to effectively communicate this same information to screen reader users, including Plaintiff, because the Website lacks sufficient alternative text to verbally communicate this rating information. This ineffective communication makes it difficult, or impossible, for Plaintiff to determine how other consumers like or dislike a particular product. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/1084373740/f1de45f32f.

(b)     Defendant visually communicates the colors in which a product is unavailable with dimmed and strikethrough fonts. Consumers who perceive content visually will see these visual cues and understand that the product is unavailable in the corresponding colors. Defendant fails to effectively communicate this same information to screen reader users, including Plaintiff, because the Website lacks alternative text to verbally communicate which colors are unavailable. This ineffective communication makes it difficult, or impossible, for Plaintiff to discover which colors are out-of-stock. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/1084373784/07ed0525bb.

(c)     Defendant uses visual cues to communicate the colors in which a product is available. Consumers who perceive content visually will see these visual cues and understand that the product is available in the corresponding colors. Defendant fails to effectively communicate this same information to screen reader users, including Plaintiff, because the Website lacks

alternative text to verbally communicate the colors in which a particular product is available for purchase. This ineffective communication makes it difficult, or impossible, for Plaintiff to determine the options available for purchase. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/1084373836/4a7a1eb75c.

(d)     Defendant visually communicates account sign in information on the Website. Consumers who perceive content visually will see an information icon next to the "Keep me signed in" option. These consumers can click the icon to learn more about staying signed into their account. Defendant fails to effectively communicate this same information to screen reader users, including Plaintiff, because the Website fails to notify screen reader users of the existence of the icon. This ineffective communication makes it more difficult, or impossible, for Plaintiff to learn more about Defendant's "Keep me signed in" option. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/1084373883/8262ebf0e3.

40.     Defendant's ongoing failure to effectively communicate with Murphy, together with Defendant's insufficient policies and practices giving rise to this ineffective communication, deny Murphy full and equal access to Defendant's physical facilities and the goods and services Defendant makes available at its physical facilities.

41.     Defendant's ongoing failure to effectively communicate with Murphy, together with Defendant's insufficient policies and practices giving rise to this ineffective communication, humiliate and deter Murphy from using the Website to access Defendant's physical facilities and the goods and services Defendant makes available at its physical facilities.

42.     Still, Murphy intends to return to the Website within the next six months to determine if Defendant effectively communicates with him and, if so, to attempt to access

Defendant's physical facilities and the goods and services Defendant makes available at its physical facilities.

## SUBSTANTIVE VIOLATION

### Title III of the ADA, 42 U.S.C. § 12181 *et seq*.

43. The assertions contained in the previous paragraphs are incorporated by reference.

44. Murphy is a person with a "disability." 42 U.S.C. §§ 12102(1)(A), 12102(2)(A).

45. Defendant is a "public accommodation." 42 U.S.C. §§ 12181(7)(E), (F).

46. Defendant violated the ADA by, among other things, denying Murphy the full and equal enjoyment of goods, services, facilities, privileges, advantages, or accommodations; denying Murphy an opportunity to participate in or benefit from goods, services, facilities, privileges, advantages, or accommodations; providing Murphy an unequal opportunity to participate in or benefit from goods, services, facilities, privileges, advantages, or accommodations; excluding Murphy , denying him services, and treating him differently than others because of the absence of auxiliary aids and services, or the failure to modify policies and practices; and failing to effectively communicate with Murphy . 42 U.S.C. §§ 12182(a), 12181(b)(1)(A)(i), 12181(b)(1)(A)(ii), 12182(b)(2)(A)(ii), 12182(b)(2)(A)(iii).

47. These violations denied Murphy full and equal access to Defendant's physical facilities and the goods and services Defendant makes available at its physical facilities.

48. These violations also humiliate and deter Murphy from using the Website to access Defendant's physical facilities and the goods and services Defendant makes available at its physical facilities, thereby forcing Murphy to wait until Defendant elects to retrofit the Website to be accessible.

## PRAYER FOR RELIEF

WHEREFORE, Murphy requests judgment as follows:

(A)    A declaratory judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took insufficient action to ensure Murphy could use the Website to fully, equally, and independently access Defendant's physical facilities and the goods and services that Defendant makes available at its physical facilities;

(B)    A permanent injunction under 42 U.S.C. § 12188(a)(2) and 28 C.F.R. § 36.504(a) which directs Defendant to take all steps necessary to ensure Defendant's physical facilities and the goods and services that Defendant makes available at its physical facilities are fully, equally, and independently accessible to Murphy by the Website, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following policies and practices that will cause Defendant to remain in compliance with the law—the specific injunctive relief requested by Murphy is described more fully below;

(1)    Within 60 days of the Court's order, Defendant shall designate a team of its employees and/or contractors as the accessibility coordination team for the Website, which team will be responsible for ensuring Defendant's compliance with the Court's order;

(2)    Within 90 days of the Court's order, Defendant shall appoint or retain an Accessibility Consultant who is knowledgeable about digital accessibility, the ADA, and the Web Content Accessibility Guidelines 2.1 A/AA, developed by the W3C and available at https://www.w3.org/TR/WCAG21/. The Accessibility Consultant's duties shall include assisting Defendant in ensuring the Website conforms with Web Content Accessibility Guidelines 2.1 A/AA and provides effective communication to screen reader users.

(3)    Within 120 days of the Court's order, Defendant shall develop and implement an Accessibility Strategy designed to ensure the Website conforms with Web Content Accessibility Guidelines 2.1 A/AA and provides effective communication to screen reader users within 18 months of the Court's order.

(4)    Within 120 days of the Court's order, Defendant shall develop and publish an Accessibility Statement that advises visitors that Defendant is making efforts to ensure that its Website conforms with Web Content Accessibility Guidelines 2.1 A/AA and provides effective communication to screen reader users, and includes an accessibility feedback form that invites visitors to contact Defendant with their accessibility concerns or questions. Defendant shall add a link at the beginning of the Website's landing pages, directing screen reader users to the Accessibility Statement. Defendant shall have the option to make this link invisible to customers who do not use screen readers.

(5)    Within 150 days of the Court's order, Defendant shall ensure its customer service personnel are trained to assist individuals with disabilities (including individuals who are blind) who encounter difficulties using the Website, and to forward any accessibility-related questions or complaints to Defendant's accessibility coordination team so they may be remediated.

(6)    Within 180 days of the Court's order, Defendant shall modify its existing bug fix policies, practices, and procedures to include the elimination of bugs that cause the Website to fail to provide effective communication to screen reader users. Defendant shall ensure that any bugs that cause the Website to fail to provide effective communication to screen reader users are remedied with the same level of priority (e.g., speed, resources used to remedy, etc.) as any other equivalent loss of function for individuals who are not blind.

(7)    Within 210 days of the Court's order, Defendant shall train all employees responsible for website or mobile application design, development, or maintenance to ensure the future design, development, and maintenance of the Website conforms with Web Content Accessibility Guidelines 2.1 A/AA, and provides effective communication to screen reader users. Defendant shall provide accessibility training to all newly-hired employees responsible for website or mobile application design, development, or maintenance within the latter of 210 days of the Court's order or 90 days of their hire date. Commencing in 24 months of the Court's order, Defendant shall ensure that all then-current employees responsible for website or mobile application design, development, or maintenance are provided with refresher accessibility training at regular intervals that shall not exceed two years.

(8)    Until furthered ordered by the Court, Defendant or its Accessibility Consultant shall perform an automated accessibility audit on at least a monthly basis to evaluate whether the Website conforms with Web Content Accessibility Guidelines 2.1 A/AA, and provides effective communication to screen readers. At minimum, the monthly accessibility audit shall include each home or landing page of the Website, and a sampling of web pages that visitors would access to (a) perform a search, (b) view a product, (b) complete a purchase, and (d) contact customer service.

(9)    Until furthered ordered by the Court, Defendant or its Accessibility Consultant shall perform end-user accessibility/usability testing on at least a quarterly (four times per year) basis to evaluate whether the Website conforms with Web Content Accessibility Guidelines 2.1 A/AA, and provides effective communication to screen readers. At minimum, the quarterly end-user accessibility test shall include each home or landing page of the Website, as

well as a sampling of web pages that that visitors would access to (a) perform a search, (b) view a product, (b) complete a purchase, and (d) contact customer service.

(10)    Until furthered ordered by the Court, for each new, renewed, or renegotiated contract with a vendor of third-party content, Defendant shall seek a commitment from the vendor to provide content that conforms with Web Content Accessibility Guidelines 2.1 A/AA, and provides effective communication to screen readers.

(11)    Defendant shall provide Murphy, through his counsel, with a report on the first, second, and third anniversaries of the Court's order which summarizes the progress Defendant is making in meeting its obligations under the Court's order.

(C)    Payment of actual, statutory, nominal, and other damages, as the Court deems proper;

(D)    Payment of costs of suit;

(E)    Payment of reasonable attorneys' fees under 42 U.S.C. § 12205 and 28 C.F.R. § 36.505, including costs to monitor Defendant's compliance with the judgment;[14]

(F)    Whatever other relief the Court deems just, equitable and appropriate; and

(G)    An order retaining jurisdiction over this case until Defendant has complied with the Court's orders.

Dated: July 6, 2025                                  /s/ Lawrence H. Fisher
                                                     Lawrence H. Fisher
                                                     Pa. No. 67667
                                                     One Oxford Centre

---

[14] *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986), *supplemented*, 483 U.S. 711 (1987); *People Against Police Violence v. City of Pittsburgh*, 520 F.3d 226, 235 (3d Cir. 2008) ("This Court, like other Courts of Appeals, allows fees to be awarded for monitoring and enforcing Court orders and judgments."); *Gniewkowski v. Lettuce Entertain You Enters., Inc.*, No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191); *Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11).

301 Grant Street, Suite 270
Pittsburgh, PA 15219
Tel. (412) 577-4040
lawfirst@lawrencefisher.com